[Civ. No. 1368.   Third Appellate District.—May 10, 1915.]

## C. H. SCHMIDT et al., Respondents, v. UNION OIL COM-PANY OF CALIFORNIA (a Corporation), Appellant.

ACTION FOR DAMAGES—PERSONAL INJURIES—NEGLIGENCE—EXPLOSION OF KEROSENE OIL—INFERIOR QUALITY—SUFFICIENCY OF EVIDENCE.— In this action for damages for personal injuries sustained in an explosion of kerosene oil purchased for use in incubator lamps, it is held that the evidence is ample to support the finding of the jury that the explosion and consequent injury were due to the inferior quality of the oil and not to any want of ordinary care on the part of the injured party.

ID.—INSTRUCTIONS—JUDICIAL NOTICE—QUALITIES OF KEROSENE.—There was no error in such an action in refusing to instruct the jury that "courts will take judicial notice of the qualities of such things as artificial gas, kerosene, gunpowder and dynamite and the like," as the general quality or character of such substances was of no concern to the jury, who were to decide whether the oil was of inferior quality, below the ordinary standard and therefore unsafe for the use to which it was put.

ID.—ARGUMENT—FAILURE TO PRODUCE WITNESSES.—It is within the legitimate range of argument for the attorney for the plaintiff in his closing argument to the jury in such action to comment upon the circumstance of the failure of the defendant to produce the persons who signed the test report of the oil which the defendant introduced in evidence.

APPEAL from a judgment of the Superior Court of Fresno County.   M. L. Short, Judge presiding.

The facts are stated in the opinion of the court.

W. A. Sutherland, and Thos. O. Toland, for Appellant.

Harris & Hayhurst, Joel H. Smith, and George Cosgrave, for Respondents.

BURNETT, J.—Plaintiffs are husband and wife and the judgment was in their favor for twelve thousand five hundred dollars as damages for injuries sustained by Lizzie Schmidt in an explosion of oil purchased from defendant.   The appeal is from the judgment under the alternative method.   (Code Civ. Proc., sec. 953c.)

It is alleged in the complaint that plaintiffs were engaged in the poultry business and, in the prosecution of said business, used incubators for the purpose of hatching eggs by artificial heat; that, to generate such heat, they burned kerosene oil which they bought from defendant; that the use of said oil of ordinary quality for such purpose is entirely safe and attended with no danger of explosion. "That prior to about March 15, 1911, they had purchased oil of this character from defendant which was entirely safe; that defendant at all times knew the use to which the oil purchased from it by plaintiffs was put. That on or about March 15, 1911, they purchased a quantity of kerosene oil for their incubator lamps believing it to be of the same quality as that theretofore sold them by defendant, but defendant, disregarding its duty in that behalf, negligently and carelessly sold them oil of a highly dangerous and explosive character.

"That on March 29, 1911, while plaintiff Lizzie Schmidt was using a part of the oil so purchased from defendant in the incubator lamps in the ordinary and customary manner and without any fault or negligence on the part of plaintiffs, the oil ignited and exploded and shattered the lamp and seriously burned plaintiff Lizzie Schmidt to the damage of plaintiffs in the sum of $25,000."

A second cause of action was afterward added by consent, containing the additional allegation: "That all of the oil sold by defendant to plaintiffs as herein described was manufactured by said defendant." This was for the purpose, so it is stated by respondents, of showing a statutory warranty.

Mrs. Schmidt testified that, in March, 1911, they were running fourteen incubators and her particular business in the matter was caring for the lamps. She "was attending to the wicks and keeping them perfectly clean, and seeing that they were in good shape and in perfect order when they were attended to" and she gave each lamp a thorough cleaning once a day. That, prior to the month of March, the oil they had been getting from the Union Oil Company gave good satisfaction but later "it burned badly for one thing and smoked more or less and didn't give good satisfaction in a general way; it would not burn bright or clear." The oil was delivered at the house from the company's tank wagon. That she complained to the driver of the wagon "about the quality of the oil, or that is, that it was not giving good satis-

faction at the time we were using it." That, on the twenty-ninth day of March, in the afternoon, she started to clean the lamps. As she stooped down and "unhooked the little hooks that carried the lamp and brought it, as I should, to set it down, it exploded with a great force in my face, and had a report like a gun, went off immediately with a great splash in my face, and, of course, naturally caught me on fire all over my shoulders, my dress and my hair." She had not opened it and did nothing whatever to the lamp except to take it off the hook. At the time of the explosion she was holding the lamp with both hands in front of her, "going to put it on top of the incubator." After the explosion she rushed from the building all ablaze and she and her husband extinguished the flames. It is not disputed that she was frightfully injured and disfigured, nor is it claimed that the amount awarded is disproportionate to the degree of severity of her injuries. In fact, it is apparent from the record that the full amount claimed would be no more than just recompense if defendant was liable at all, and as, in the closing brief, appellant recedes from the position taken in its opening, that the verdict was excessive, we need not dwell upon the shocking features of the injury.

The oil, as it was received from the defendant's tank wagon, was placed in a large sixty-gallon tank close to where the incubators were kept and from this she drew it in a gallon can from which she filled the lamps. She testified further that, in cleaning the lamps, "I would always look at it to see that the wick was perfectly clear from any char here; it was always trimmed and always cleaned off;" and she had a little brush and always carried a cloth to see that the lamp was perfectly clean and she had a pair of little scissors to trim the wick and she always kept the lamp "absolutely clean. It was just like almost a new lamp; of course, it would not look as bright and clean as that but it would be in perfect order."

Mr. Schmidt corroborated his wife as far as his knowledge extended. He called attention to one additional circumstance, that the oil tank from which they received the oil had several compartments, one of which contained coal oil and another gasoline and that the faucet to each compartment was similar to all the others. These faucets were at the back of the wagon, six or eight inches apart. Once Mr. Schmidt had asked the driver if he ever made a mistake on account of

the faucets being alike and the latter said: "Well, I did make a mistake at one time but I corrected it myself before any trouble happened." The driver also told him that the compartments were not the same size and they used them interchangeably for the different products, oil and gasoline, as their business required.

As to the technical test of the quality of the oil, Mr. Schmidt testified that, on the fifth day of April, following the explosion, he drew about a quart of the oil from the sixty-gallon tank and sent it to F E. Twining, a chemist in Fresno; that no oil had been put into the tank between the time of the accident and the taking of the sample and that there was no way for anything to get into this tank unless it came from the wagon.

It appeared that oil was delivered to plaintiffs on the 6th, 13th, 20th, and 29th of March and it was stipulated that defendant had made two shipments of oil "from its refinery at Oleum to the substation at Reedley, one in January, and the other one arriving in Reedley on the 16th of March, and that it was from this oil delivery, sent down to Reedley and arriving on the 16th of March that the oil in question and burning in the lamps on the 28th and 29th of March, 1911, was taken and that which was delivered also on the 29th was from the same oil as delivered on the 16th of March, from the same car."

F. E. Twining qualified as a chemist and he testified that he made a flash test of the oil that he received from Mr. Schmidt. He found the flash test was 88°. The flash test is indicative of the amount of volatile vapor, that is, inflammable vapors in the oil. The lower the flash test the more dangerous is the oil. The flash test is the temperature at which oil will give off vapor enough to ignite. The flash test of oil regarded as safe is 110°. The witness did not consider it a safe oil. The apparatus by which he determined the flash point was what he calls an Elliott tester but he claimed that it belongs to the class known as open testers. The closed tester, it may be said, shows the flash point at about twenty degrees lower than does the open tester. He also ascertained this point by the Tagliabue method, which is the method recognized on the Pacific Coast, and found it to correspond substantially with the other, placing it at 88°.

27 Cal. App.—24

He also made a chemical analysis of the oil by distillation and found that it contained 2.98 per cent of the naptha group, which would account for the low flash test and for that reason he did not consider it a safe oil for use in an incubator.

W. A. Smith was employed by plaintiffs and was on the premises at the time of the accident. He went into the basement immediately after the explosion and picked the lamp off the floor six or eight feet from where the accident happened. The bottom of the lamp was lying on top of the incubator. The burner was lying off in a different direction from the lamp.

W. C. McFarlane, an expert poultry raiser and who was familiar with the use of incubators testified, that he had been agent for the Jubilee incubators for eighteen years (the one in question being a Jubilee incubator) and that they were what are known as the sun hinge burners and were the best made—as good as could be produced. On cross-examination he was shown the lamp that exploded and asked if it looked as though an explosion had blown the burner out of the collar and he gave it as his opinion that the burner had been blown off.

We think it cannot be doubted that the foregoing justifies a rational inference that the explosion and consequent injury to Mrs. Schmidt were due to the inferior quality of the oil and not to any want of ordinary care on her part. The evidence would seem to be ample to support the finding of the jury in that respect.

However, we may notice a little more in detail the criticism of that evidence by appellant and devote some attention to what are claimed to be errors in the trial of the cause.

Appellant questions the veracity of Mrs. Schmidt as follows: "If the lamp, hanging in under the incubator, only about two feet from the ground, exploded the moment she touched it or started to take it out, how did the flames catch her in the face and breast and on her shoulders and back and on no other part of the body or lower limbs? If she was down in under the incubator when the explosion occurred, so that the flames could have reached her in that manner, then how did the incubator come to be burned on top and not on the bottom or lower part of the sides or ends? And how did the lamp's bottom get on top of the incubator?" To this it is proper to rely that her testimony as a whole must be considered and she cannot be judged by a single detached sen-

tence. It is true that she answered, "Yes, sir," to the question: "And it exploded the moment you unhooked it?" but she explained further by stating what we have already quoted to the effect that she had brought it to the top of the incubator and was about to set it down when it exploded. But, aside from this, it would hardly be fair to require any witness, under the same circumstances, to detail with strict accuracy such a startling, unexpected, and disastrous occurrence. It is quite likely that she did better than most persons could if subjected to the same trying experience. Whatever criticism may be made of isolated statements of the witness, it is entirely clear that her completed story is not improbable, and an appellate court cannot say that the jury were not authorized to accord full credence to her testimony. Believing, as the jury undoubtedly did, that she was trying to tell the truth, they could reach no other conclusion than that the explosion was not due to her carelessness or want of attention to the lamps.

Appellant, probably, has more confidence in the point that the evidence is not sufficient to support respondents' theory as to the quality of the oil. Herein, though, we may say, with proper respect for the able counsel for appellant, that they seem to mistake the function of this court for that of the jury or the trial judge. Much of the argument as to this point, we think, could with greater propriety have been addressed to these other tribunals. We do not see how it can be said that there was no substantial showing that said oil was of inferior quality and dangerous.

Appellant declares: "The oil that was in the lamp *which exploded was delivered March 20.* There was *another delivery* of oil in said tank on the *29th day of March, which filled the tank to the amount of 60 gallons.* Plaintiffs continued to use the oil from this tank for several days after the 29th of March or until it was about all used up." Attention is further called to the fact that the sample was taken from the tank "*seven* days after the last delivery of oil from the Union Oil Company and *sixteen* days after the delivery of the oil which was in the lamp at the time of the explosion, which according to plaintiffs' testimony of the amount of oil used daily, would show but very little, if any, of the oil delivered on March 20th and that mixed with the oil delivered on March 29th." These suggestions seem to be made to create the im-

pression that the proof fails at the point of identity of the oil analyzed and tested with that in the lamp at the time of the explosion or of similarity in quality between the two. This apparent weakness, however, is removed by the stipulation to which we have already referred. Of course, the oil sent to Mr. Twining was not the same oil as was in the lamp when the unfortunate accident occurred, for a very obvious reason, but, according to the stipulation, the two quantities were taken "from the same oil." It was, therefore, at least a fair, if not necessary, inference that they were alike. Manifestly, no proof of the certainty of mathematical demonstration could be made of the quality of the oil which exploded, but the evidence furnished by plaintiffs seems to have been legitimate, plausible, and persuasive.

It is also claimed by appellant that the proper inference from Mr. Twining's testimony is that the oil in question was good commercial oil. Part of his testimony is quoted and it is insisted that from this the conclusion follows that his experiment was made in a closed cup and "that his result of 88 *is equivalent to from 108 to 113 degrees made by the uniform Pacific Coast test, the open cup test,* which shows that the oil complained of was not oil of a highly dangerous, volatile, inflammable and explosive nature and character, but was *good commercial oil of the ordinary grade, of the ordinary flash test as understood by the manufacturers and dealers along the Pacific Coast."*

Here again, though, as we conceive it, appellant has failed to give proper consideration to the entire testimony of the witness. We need not quote extensively from it but he entered elaborately and apparently with learning into an explanation of the different scientific methods of ascertaining said quality and he did say: "Well, the Elliott test is, test as I have it, is not a closed test"; and, furthermore, the record shows: "The Court: Did you start in with the Elliott test or open test—or the one in the open test? A. The Elliott; it is practically the open cup." But it also appears that he made a test with the Tagliabue outfit, which is admittedly an open test, and as to that he declared that the result was just .6 of a degree lower than that obtained by the other, or so-called Elliott test.

In addition, as we have already seen, he ascertained the character of the oil by distillation, which is asserted by re-

spondents to be "the only accurate method." We need not dwell further upon this phase of the case. Certainly, the just inferences from the testimony of Mr. Twining are all in favor of respondents' position.

Appellant also directs attention to certain circumstances— for instance, the lack of sufficient ventilation in the basement where the incubators were operated, as evidence that the explosion was due to another cause than the quality of the oil, but their probative force was obviously for the jury and we think we are not called upon to consider them further.

There is quite a number of assignments of error but most of them we view as entirely destitute of merit. The following examples may be selected, possessing probably as much merit as the other specifications.

There was surely no error in refusing this instruction: "Courts will take judicial notice of the qualities of such things as artificial gas, kerosene, gunpowder and dynamite and the like." It is probably true that the court would take judicial notice of the general quality or character of these substances but that was of no concern to the jury in the present case. The question here was whether the oil was of inferior quality, below the ordinary standard and therefore unsafe for the use to which it was put and that obviously was a consideration for the determination of the jury. Of course, no one would contend that such question should have been withdrawn from the jury and the instruction, if abstractly correct in a general way, could not have aided the jury in deciding the issues submitted to them, but, on the contrary, if given, it would likely have confused and misled them.

Appellant took exception to the following portion of the closing argument of respondents to the jury: "In the first place, I believe that if there hadn't been something very peculiar about that oil, they would have had witnesses in here to prove what the flash test point was. Now, what have they introduced on that point? They have introduced this paper here, signed by somebody that signed his name as inspector, and by somebody else who signs his name as tester, and the initials of somebody, a special agent. Now this was done in 1911, fourth of March. The judge admitted this over our objections simply for what it was worth. Now you remember, gentlemen of the jury, that the men who signed this, there is no evidence that they ever made this test. You don't know

but what they just signed this up without looking into it. You don't know how careless they were. You don't know what tests they made or anything of that kind. This was put in here, and they, for some reason, are not here. We couldn't bring them here. We couldn't tell who was the tester. We didn't know that this report was going to be asked to be introduced. I have no doubt that these men, at least two of them, are still in the employ of this company. We must assume that. Why didn't they have them here, so that we could cross-question them?''

We think the foregoing is within the legitimate range of argument. Our attention is not called to any portion of the transcript that discredits any statement of fact in said argument and, of course, we must assume that the learned counsel for respondents was acting in good faith with no desire to make an unwarranted appeal to the passion or prejudice of the jury. The said tester's and inspector's report which was admitted in evidence purported to be signed as follows: "Union Oil Co. of Cal., Reedley, Cal. C. H. Stamm, inspector; J. P. Blowski, tester; R. H. H., special agent." It would not have been proper for respondents to criticise, before the jury, the action of the trial court in admitting said document in evidence over their objection, nor can they complain of it here since they are not appealing. But it is quite plain, we think, that the significance of the report would have been greatly emphasized and enhanced if it had been supplemented by the testimony of the parties who made it, and we can see no reason for precluding comment upon the circumstance that said parties were not called as witnesses.

We have made a careful examination of the record and briefs and, while not noticing here specifically all the points made by appellant, we are persuaded that there is ample evidence to support the verdict and that no prejudicial error was committed in the court below. Indeed, we may say that the record discloses the utmost care on the part of the trial judge to secure a fair and impartial trial and we cannot say that appellant has any just cause for complaint at the result.

The judgment is affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on June 9, 1915, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 8, 1915.